# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**KARIE L. LAUDE**
        **Plaintiff,**

    **v.**                                        **Case No. 20-C-1599**

**KILOLO KIJAKAZI,**
**Acting Commissioner of the Social Security Administration**
                   **Defendant.**

---

## DECISION AND ORDER

Plaintiff Karie Laude seeks judicial review of the denial of her application for social security disability benefits. For the reasons that follow, I remand for further proceedings.

### I. FACTS AND BACKGROUND

**A.**     **Plaintiff's Impairments**

Plaintiff suffers from a variety of impairments, including bipolar disorder, fibromyalgia, inflammatory arthritis, chronic migraine headaches, obesity, and sleep apnea. Plaintiff's psychiatrist, Dr. Michael Eis, treated her with lithium, producing good results in terms of mood stability, with largely normal mental status exams. (Tr. at 864, 865, 866, 889-90.) Dr. Eis nevertheless supported plaintiff's application for disability benefits. In a January 29, 2019, treatment note, Dr. Eis indicated: "Patient, in my opinion remains unable to do work [of] any sort due to her illness. . . . Mood symptoms remain under good control but patient unable to work due to severe fibromyalgia of unclear origin." (Tr. at 864.)

In a November 20, 2019, mental impairment questionnaire, Dr. Eis indicated he had seen plaintiff every three months since July 2017. He listed diagnoses of bipolar I depression,

fibromyalgia, RA (rheumatoid arthritis), and migraines. (Tr. at 883.) Asked to identify signs and symptoms, Dr. Eis wrote "none currently." (Tr. at 884.) Regarding the mental abilities needed for unskilled work, he found plaintiff "seriously limited" in the ability to deal with normal work stress; "limited but satisfactory" in the remembering work-like procedures, completing a normal workday without interruptions from psychologically based symptoms, and performing at a consistent pace without unreasonable breaks; and "unlimited or very good" in all other areas listed on the form (e.g., carry out short and simple instructions, maintain attention for a two hour segment, sustain an ordinary routine without special supervision). Asked to explain the serious limitation, Dr. Eis wrote "combination of work resiliency and chronic physical pain related causes." (Tr. at 885.) Regarding the mental abilities needed for semi-skilled and skilled work, Dr. Eis rated plaintiff seriously limited in the ability to deal with the stress of such work; limited but satisfactory in the ability to understand, remember, and carry out detailed instructions; and unlimited or very good in the ability to set realistic goals or make plans independently of others. He provided the same explanation for the serious limitation. Dr. Eis further rated plaintiff as limited but satisfactory in the ability to interact appropriately with the general public, and unlimited or very good in maintaining socially appropriate behavior, adhering to basic standards of neatness, traveling in unfamiliar places, and using public transportation. He checked "yes" to indicate that psychiatric conditions exacerbated plaintiff's experience of pain, explaining that "diminished psychological tolerance to stress would and has exacerbated perception of physical pain, in large part due to recently diagnosed RA." (Tr. at 886.) Under the so-called "paragraph B criteria" of the mental impairment Listings, Dr. Eis found no to mild limitation in plaintiff's ability to understand, remember, or apply information; interact with others; and adapt or manage oneself; but a moderate limitation in her ability to concentrate, persist, or maintain

2

pace. (Tr. at 887.) Finally, Dr. Eis indicated that plaintiff would be absent more than four days per month due to her impairments or treatment. (Tr. at 888.)

Plaintiff saw rheumatologists regarding her fibromyalgia and rheumatic/inflammatory arthritis, receiving a variety of medications but reporting little improvement in her symptoms of pain, synovitis, and fatigue. (Tr. at 912, 915, 917, 921, 1006, 1098-99, 1110, 1143, 1667, 1672, 1674.) She also saw neurology regarding her headaches, reporting about two migraines per month. (Tr. at 1069.) The record further documents several courses of physical therapy for knee, neck, and back pain, with plaintiff generally reporting improvement in her musculoskeletal complaints but continued chronic pain related to fibromyalgia. (Tr. at 963, 1406, 1448, 1449, 1464, 1526, 1574, 1576, 1618.) She also received steroid injections for hip bursitis. (Tr. at 1660, 1665.) Finally, plaintiff underwent studies related to her difficulty sleeping, which revealed moderate obstructive sleep apnea, with a recommendation for CPAP treatment. (Tr. at 1041, 1294, 1297, 1627.)

**B.    Procedural History**

**1.    Plaintiff's Application and Agency Decisions**

Plaintiff filed the instant application in October 2018, alleging a disability onset date of September 5, 2018.[1] (Tr. at 183.) In a function report, plaintiff stated that her mental health cycled between anger and crying spells. Physically, she could not lift, push, or pull much, nor could she sit or stand for long. She also struggled with memory and concentration, and experienced debilitating fatigue. (Tr. at 227.) She reported preparing simple meals, cleaning, and doing laundry. (Tr. at 229.) Hobbies including watching TV and playing games on her

---

[1]The onset date was tied to a previous application, denied by an ALJ on September 4, 2018. (Tr. at 89-103.)

3

phone. She reported problems getting along with her mother, due to childhood abuse, and her boyfriend, as he was emotionally abusive. (Tr. at 231.) In a physical activities addendum, plaintiff reported that she could sit for 30 minutes, stand for five minutes, and walk for 15 minutes. (Tr. at 235.)

The agency denied the application initially on November 19, 2018, based on the reviews of Deborah Pape, Ph.D., and William Fowler, M.D. (Tr. at 57, 110.) Dr. Pape found no limitation in understanding, remembering, or applying information; mild limitation in interacting with others; moderate limitation in concentrating, persisting, or maintaining pace; and moderate limitation in adapting or managing oneself. (Tr. at 62.) In evaluating plaintiff's mental residual functional capacity ("RFC"), Dr. Pape found no understanding and memory limitations. (Tr. at 66.) In the area of concentration and persistence, Dr. Pape found plaintiff not significantly limited in the ability to carry out very short and simple instructions, sustain an ordinary routine without special supervision, work in coordination with others, and make simple work-related decisions, but moderately limited in the ability to carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, and complete a normal workday or workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. at 66-67.) Dr. Pape concluded that plaintiff "would be able to focus to complete a simple task but due to her bipolar and underlying physical condition she would have difficulty with more complex tasks." (Tr. at 67.) Dr. Pape found no social interaction limitations. Finally, regarding adaptation, Dr. Pape found plaintiff not significantly limited in the ability to be aware of normal hazards, travel in unfamiliar places, and set realistic goals, but moderately limited in the ability

4

to respond appropriately to changes in the work setting. (Tr. at 67.) Dr. Pape concluded that due to her bipolar symptoms plaintiff "would benefit from employment that has a fairly set routine with minimal deviations." (Tr. at 67.) Dr. Fowler found plaintiff physically capable of light work, with no other limitations. (Tr. at 64-66.)

Plaintiff requested reconsideration (Tr. at 114), but the agency denied that request on April 27, 2019, based on the reviews of Ellen Rozenfeld, Psy.D., and Douglas Chang, M.D. (Tr. at 78-85, 88, 115.) Dr. Rozenfeld found a mild limitation in understanding, remembering, or applying information; mild limitation in interacting with others; moderate limitation in concentrating, persisting, or maintaining pace; and moderate limitation in adapting or managing oneself. (Tr. at 78.) Her mental RFC assessment matched Dr. Pape's. (Tr. at 83-84.) Dr. Rozenfeld concluded that plaintiff "retains the capacity to understand, remember, carry out and sustain performance of simple, repetitive work tasks, complete a normal workday, interact adequately with coworkers/supervisors/public and adapt to changes/stressors associated with simple routine competitive work activities." (Tr. at 84.) Dr. Chang agreed that plaintiff could perform light work with no other physical limitations. (Tr. at 81.)

Plaintiff then requested a hearing before an ALJ. (Tr. at 124.)

### 2. Hearing

On February 19, 2020, plaintiff appeared with counsel for her hearing in front of the ALJ. The ALJ also summoned a vocational expert ("VE") to offer testimony on jobs plaintiff might be able to do. (Tr. at 34.)

Plaintiff testified that she was 36 years old, with a high school education and work history as a cashier. (Tr. at 40-41.) Asked why she could not work, plaintiff mentioned pain and fatigue. She also reported trouble sleeping, leaving her exhausted during the day, and

constant pain related to her fibromyalgia and rheumatism. (Tr. at 42.) She further reported issues with her mental health; while she used to be able to handle those issues with medication, with her other problems her moods were "all over the place." (Tr. at 43.)

For pain, plaintiff took muscle relaxers, which helped, and used ice packs and heating pads, which did not do much for her. (Tr. at 43.) She also took medication for sleep, which helped some days, not others. (Tr. at 43-44.) She continued to take lithium for bipolar disorder, which helped some, but with everything else going on in her life it was not enough. (Tr. at 44.)

In her pre-hearing report, plaintiff reported cooking simple meals, performing some household chores, and watching television. She testified that she struggled more now, needing help with things around the house. (Tr. at 45.) She tried to walk for exercise. (Tr. at 46.) She had a horse but did not ride very often. (Tr. at 47.) She rarely went out. (Tr. at 47.)

The VE testified that plaintiff's past relevant job as a cashier was light and semi-skilled. (Tr. at 52.) The ALJ then asked a hypothetical question, assuming a person of plaintiff's age, education, and work experience, limited to sedentary, unskilled work; job tasks and instructions that are simple and routine; can occasionally climb ramps and stairs and engage in postural movements; perform jobs having only occasional decision-making and changes in work setting; able to maintain attention and concentration for two-hour segments throughout the day; and have occasional interaction with the public, co-workers, and supervisors. (Tr. at 52.) The VE testified that such a person could not perform plaintiff's past work but could do other jobs, such as assembler, inspector, or sorter. (Tr. at 53.) The VE testified that employers would not tolerate extra breaks or more than one absence per month. (Tr. at 53-54.)

### 3.     ALJ's Decision

On March 23, 2020, the ALJ issued an unfavorable decision.  (Tr. at 10.)  Following the familiar five-step process, the ALJ determined at step one that plaintiff had not engaged in substantial gainful activity since September 5, 2018, the alleged onset date, and at step two that she suffered from the severe impairments of inflammatory arthritis, fibromyalgia, headaches, obesity, and bipolar/depression disorder (Tr. at 15).

At step three, the ALJ determined that none of plaintiff's impairments met or medically equaled a Listing.  (Tr. at 17.)  The ALJ evaluated plaintiff's mental impairments under Listing 12.04, which is satisfied if the claimant has one "extreme" or two "marked" limitations under the paragraph B criteria: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself.  (Tr. at 18.)

In understanding, remembering, or applying information, the ALJ found a mild limitation. (Tr. at 18.)  While plaintiff reported some problems in this area, her providers noted mild to no symptoms.  Her psychiatrist, Dr. Eis, noted intact cognition, linear thought process, and intact insight and judgment.  Other providers noted intact cognition, intact fund of knowledge, and normal thought content.  (Tr. at 19.)

In interacting with others, the ALJ found a moderate limitation.  While plaintiff reported problems getting along with her mother and boyfriend due to the abusive nature of their relationships, she stated she had no problem with authority figures, and her providers noted she exhibited normal behavior.  She appeared depressed at times, but generally presented with an appropriate or euthymic mood and affect.  (Tr. at 19.)

The ALJ found a moderate limitation in concentration, persistence, and pace.  Plaintiff

7

alleged that her impairments affected her ability to complete tasks, concentrate, and follow instructions. However, Dr. Eis noted that her thought process was linear, her associations were logical, and her thought content devoid of suicidal or homicidal ideation. Other providers noted normal attention span and concentration. (Tr. at 19.)

As for adapting and managing oneself, the ALJ found moderate limitation. Plaintiff reported needing reminders to perform personal care and take medication, but she admitted performing a number of activities, going out alone, and managing her finances. (Tr. at 19.) Further, while she reported difficulty handling stress and changes in routine, her providers noted that her symptoms remainded under good control with medication and she generally presented with normal grooming. (Tr. at 19-20.)

Prior to step four, the ALJ found that plaintiff had the RFC to perform sedentary work, except that she was limited to jobs that are unskilled and involve simple and routine tasks and instructions; she could maintain attention and concentration for two-hour segments; she was limited to jobs having only occasional decision-making and changes in work setting; she could occasionally climb ramps and stairs and engage in postural movements; and she could have occasional interaction with the public, co-workers, and supervisors. (Tr. at 20.) In making this finding, the ALJ considered plaintiff's symptoms and the medical opinion evidence. (Tr. at 21.)

In considering the symptoms, the ALJ noted the required two-step process under which he first had to determine whether plaintiff had an underlying medically determinable impairment that could reasonably be expected to produce plaintiff's pain or other symptoms. Second, once such an impairment had been shown, the ALJ had to evaluate the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limited plaintiff's work-related abilities. For this purpose, if the statements were not substantiated by objective

8

medical evidence, the ALJ had to consider other evidence in the record to determine if the symptoms limited plaintiff's ability to do work-related activities. (Tr. at 21.)

Plaintiff based her application on a variety of impairments, including fibromyalgia, migraines, bipolar disorder, chronic fatigue, rheumatism, obesity, and hypersomnia. She alleged that these impairments affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, see, remember, complete tasks, concentrate, understand, follow instructions, use her hands, and get along with others. She reported migraines two to four times per month causing loss of vision. She stated that on her best day, her pain was moderate; on her bad days, she was completely overwhelmed. (Tr. at 21.)

The ALJ found that plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (Tr. at 21.) In support of this finding, the ALJ first indicated that plaintiff's providers noted relatively mild physical findings during the relevant period, which were inconsistent with plaintiff's reported limitations. (Tr. at 21.) Concerning her arthritis and fibromyalgia, the ALJ cited a number of records documenting decent movement, normal gait, normal motor strength, and normal grip strength. (Tr. at 21-22.) Concerning her headaches, plaintiff did not present for care while actively experiencing a headache, and her eye examinations were stable. (Tr. at 22.)

The ALJ next stated that plaintiff's treatment history was not consistent with the allegations of disabling symptoms. (Tr. at 22.) The record showed that plaintiff reported improvement in symptoms with largely routine and conservative treatment, and managed her symptoms with physical therapy, injections, and medication. (Tr. at 22-23.) For instance, she

9

reported feeling 70% better after a course of physical therapy, and that her headache medications were at least somewhat effective. (Tr. at 23.)

The ALJ further noted that the diagnostic evidence failed to support plaintiff's allegations of debilitating pain. The ALJ cited normal hand x-rays, largely normal cervical and lumbar spine x-rays, and unremarkable MRI and CT scans of the head and cervical spine. (Tr. at 23.)

Regarding plaintiff's mental condition, her providers also noted relatively mild symptoms. Treating psychiatrist Dr. Eis noted intact cognition, linear thought process, intact insight and judgment, and normal speech. Other providers noted intact cognition, intact fund of knowledge, normal thought content, normal memory, normal behavior, normal attention span and concentration, and normal grooming. Although she reported depression or appeared depressed at times, plaintiff generally presented with an appropriate or euthymic mood and affect. (Tr. at 23.) Plaintiff's mental condition was also treated effectively with conservative measures, with providers noting good response to medication. (Tr. at 23-24.)

Finally, the ALJ found the nature and scope of plaintiff's reported activities inconsistent with the allegations of disabling symptoms. Plaintiff reported that she could clean, do laundry, drive, and shop. The medical records also documented plaintiff riding her horse, taking a trip to Texas, and doing 15 minutes of cardio on a daily basis. (Tr. at 24.)

The ALJ concluded that due to a combination of her severe and non-severe physical impairments, plaintiff was unable to sustain the lifting or carrying requirements of light or greater work and therefore was limited to sedentary work. Additionally, her obesity, arthritis, and fibromyalgia limited her to occasional climbing and postural movements. Finally, her mental impairments limited her to unskilled jobs, simple and routine job tasks and instructions, maintaining attention and concentration for two-hour segments, occasional decision-making

10

and changes in work-setting, and occasional interaction with the public, coworkers, and supervisors. (Tr. at 24.)

The ALJ next considered the medical opinion evidence. The ALJ found partially persuasive the opinions of the agency psychological consultants, Drs. Pape and Rozenfeld, who opined that plaintiff had no to mild limitation in her ability to understand, remember or apply information; mild limitation in the ability to interact with others; and moderate limitations in her ability to concentrate, persist or maintain pace, and adapt or manage herself. Drs. Pape and Rozenfeld stated that plaintiff would be able to focus to complete a simple task, and that she would benefit from employment having a fairly set routine with minimal deviations. The ALJ found that while the record partially supported their opinions, the ALJ had the benefit of reviewing the entire record, including plaintiff's hearing testimony and later mental health treatment, which supported greater limitations in her ability to understand, remember or apply information and interact with others. (Tr. at 24.)

The ALJ also found partially persuasive the opinions of the agency medical consultants, Drs. Fowler and Chang, who concluded that plaintiff could perform light work. (Tr. at 24.) While plaintiff generally presented with mild symptoms and treated conservatively, the ALJ considered the evidence that at times she presented with tenderness, reduced range of motion, and synovitis, along with her reports of incomplete relief from medications. (Tr. at 25.)

In January 2019, treating psychiatrist Dr. Eis wrote that plaintiff was unable to do work of any sort due to her fibromyalgia. The ALJ found this opinion unpersuasive as it was conclusory and inconsistent with the treatment notes documenting relatively mild symptoms. The ALJ also found the opinion outside Dr. Eis's area of expertise, as he treated plaintiff mainly for bipolar disorder yet the opinion focused on fibromyalgia as her largest limiting factor. (Tr.

11

at 25.)

In November 2019, Dr. Eis filled out an impairment questionnaire, which the ALJ found partially persuasive. Dr. Eis stated that plaintiff's bipolar depression was stable for many years using her current treatment. He opined that she was seriously limited in the ability to deal with work stress due to a combination of work resiliency and chronic physical pain. He otherwise opined that she was limited but satisfactory in her ability to remember work-like procedures, complete a normal workday without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. She had unlimited or very good abilities to perform unskilled work. For semi-skilled or skilled work, he opined that she was only seriously limited in her ability to deal with the stress of semi-skilled or skilled work due to a combination of physical and psychological considerations. He opined that she had a limited but satisfactory ability to interact appropriately with the general public and travel in unfamiliar places. She would have no to mild limitation in her ability to understand, remember, or apply information; interact with others; or adapt or manage; but a moderate limitation in her ability to concentrate, persist, or maintain pace. Finally, he opined that she would miss more than four days per month due to her impairments or treatment. The ALJ found that the opinion of no more than moderate limitations in the paragraph B criteria was supported by plaintiff's presentation with few symptoms and Dr. Eis's determination that her symptoms were controlled on medication. "However, his opinion that [plaintiff] would miss four or more days per month is not persuasive as it is not well explained, based on his opinion of the effect of [plaintiff's] fibromyalgia, for which he did not treat [plaintiff], due to his opinion that her bipolar disorder was well-controlled and when considering his recommendation that [plaintiff] only follow up with him every one to three months." (Tr. at 25.)

12

The ALJ concluded: "In sum, [plaintiff's] overall course of treatment, medications, objective medical findings, daily activities and evidence as a whole supports the above-described residual functional capacity and does not support allegations of disability." (Tr. at 26.)

At step four, the ALJ determined that plaintiff's RFC precluded the performance of her past relevant work as a cashier. (Tr. at 26.) At step five, however, the ALJ found that plaintiff could perform other jobs existing in significant numbers in the economy, as identified by the VE, including assembler, inspector, and sorter (Tr. at 26-27). The ALJ accordingly found plaintiff not disabled. (Tr. at 27-28.)

On August 27, 2020, the Appeals Council denied plaintiff's request for review (Tr. at 1), making the ALJ's decision final. See Kaplarevic v. Saul, 3 F.4th 940, 942 (7th Cir. 2021). This action followed.

## II. STANDARD OF REVIEW

A reviewing court will reverse "if the ALJ based the denial of benefits on incorrect legal standards or less than substantial evidence." Martin v. Saul, 950 F.3d 369, 373 (7th Cir. 2020). Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019). The ALJ must also build an accurate and logical bridge from the evidence to the conclusion. Jeske v. Saul, 955 F.3d 583, 587 (7th Cir. 2020).

## III. DISCUSSION

Plaintiff argues that the ALJ erred in evaluating her mental capacity, her physical capacity, and the severity of her alleged symptoms. I address each contention in turn.

13

**A.    Mental RFC**

As indicated, at step three, the ALJ found a moderate limitation in concentration, persistence, and pace (hereafter "CPP").  (Tr. at 19.)  He then adopted a mental RFC limiting plaintiff to jobs that are unskilled and involve simple and routine tasks and instructions, with only occasional decision-making and changes in work setting; he further found that she could maintain attention and concentration for two-hour segments, and that she could have occasional interaction with the public, co-workers, and supervisors.  (Tr. at 20.)  The ALJ partially credited the reports of the agency psychological consultants, Drs. Pape and Rozenfeld, who found no to mild limitation in understanding and interacting, and moderate limitations in CPP and adaptation.  The ALJ agreed with their CPP and adaptation limitations but found that the record supported greater limitations in understanding and interaction.  (Tr. at 24.)

Plaintiff argues that while the ALJ accepted the consultants' finding of moderate limitations in CPP, he failed to include such limitations in the RFC or his hypothetical question to the VE.  (Pl.'s Br. at 7.)  For example, the consultants found a moderate limitation in plaintiff's ability to maintain attention and concentration for extended periods, yet the RFC found that she could maintain attention and concentration for two-hour segments.  This finding means she could perform simple tasks at a rapid pace, meeting any quota demands, with no distractability throughout the entire workday except for three standard breaks.  Likewise, the ALJ did not explain why he omitted the other moderate limitations found by the consultants, e.g., in her ability to complete a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  (Pl.'s Br. at 8.)  Plaintiff contends that she has problems with maintaining attention and concentration, becoming distracted, remembering, and staying

14

on task, and the ALJ provided no explanation as to how these deficits were captured in the RFC. (Pl.'s Br. at 9.) This, she concludes, renders the decision legally deficient and requires remand. (Pl.'s Br. at 10.)

The Seventh Circuit has held that both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record, including even moderate limitations in concentration, persistence, or pace. Crump v. Saul, 932 F.3d 567, 570 (7th Cir. 2019); see also Yurt v. Colvin, 758 F.3d 850, 857 (7th Cir. 2014) ("As a general rule, both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record."). The court of appeals has further held that an ALJ generally may not rely on catch-all terms like "simple, repetitive tasks" to capture moderate CPP limitations; this is so because observing that a person can perform simple and repetitive tasks says nothing about whether she can do so at an acceptable pace and on a sustained basis. Crump, 932 F.3d at 570; see also Lothridge v. Saul, 984 F.3d 1227, 1233 (7th Cir. 2021) ("We have repeatedly cautioned that 'someone with problems concentrating might not be able to complete a task consistently over the course of a workday, no matter how simple it may be.'") (quoting Martin, 950 F.3d at 373-74 (collecting cases)).

On the other hand, the law does not require ALJs to use certain words, or to refrain from using others, to describe the pace at which a claimant is able to work. Martin, 950 F.3d at 374. The Seventh Circuit has affirmed where the ALJ explained how an alternately phrased RFC accounted for each of the claimant's CPP limitations, see, e.g., Martin, 950 F.3d at 374; where the CPP limitations were context or task specific, and the RFC restricted the claimant from situations likely to trigger the symptoms, see, e.g., Jozefyk v. Berryhill, 923 F.3d 492, 498 (7th

15

Cir. 2019); and where the ALJ reasonably relied upon the opinion of a medical expert who "translated" the CPP findings into an RFC determination, see, e.g., Pavlicek v. Saul, 994 F.3d 777, 783-84 (7th Cir. 2021); Burmester v. Berryhill, 920 F.3d 507, 511 (7th Cir. 2019). But see DeCamp v. Berryhill, 916 F.3d 671, 676 (7th Cir. 2019) ("[E]ven if an ALJ may rely on a narrative explanation, the ALJ still must adequately account for limitations identified elsewhere in the record, including specific questions raised in check-box sections of standardized forms such as the PRT and MRFC forms.").

The Commissioner argues that in this case the ALJ reasonably relied on Dr. Rozenfeld's narrative conclusion that plaintiff could despite her moderate limitations understand, remember, carry out, and sustain the performance of simple, repetitive work tasks; complete a normal workday; and interact adequately with coworkers, supervisors, and the public. (Def.'s Br. at 18; Tr. at 84.) The ALJ did not specifically cite this conclusion; rather, he cited the consultants' earlier statements that plaintiff would be able to focus to complete a simple task, and that she would benefit from employment having a fairly set routine with minimal deviations. (Tr. at 24.) In any event, it is unclear how the narrative conclusion incorporates all of the earlier "moderate" findings, particularly those related to performing at an acceptable pace, maintaining regular attendance, and being punctual within customary tolerances. See Hoeppner v. Kijakazi, No. 20-CV-582, 2021 U.S. Dist. LEXIS 175193, at *31 (E.D. Wis. Sept. 15, 2021); Dolezar v. Saul, No. 19-C-72, 2020 U.S. Dist. LEXIS 183776, at *20 (E.D. Wis. Apr. 29, 2020). "Because Dr. Rozenfeld's assessment fails to account for all of Mischler's limitations, the ALJ was required to account for them himself—in the hypothetical and RFC. But he did not." Mischler v. Berryhill, 766 Fed. Appx. 369, 376-77 (7th Cir. 2019); see also Varga, 794 F.3d at 815 (finding that limitation to unskilled work involving only simple work-related decisions with few if any

16

workplace changes, and no more than occasional interaction with coworkers or supervisors, failed to account for all of the claimant's CPP difficulties, as the latter limitations dealt largely with workplace adaptation, rather than CPP); Yurt v. Colvin, 758 F.3d 850, 858-59 (7th Cir. 2014) ("[W]e have repeatedly rejected the notion that a hypothetical like the one here confining the claimant to simple, routine tasks and limited interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence, and pace."). The RFC addresses plaintiff's ability to perform simple tasks and maintain attention for two-hour segments but omits limitations related to pace, attendance, and punctuality.

The Commissioner contends that under the agency's regulations there is no disconnect between a "moderate" rating and the ability to adequately perform the associated tasks. (Def.'s Br. at 19.) Under these rules, a "moderate limitation" is defined to mean that functioning in that area is "fair." Pavlicek, 994 F.3d at 783 (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1). And under ordinary usage, "fair" does not mean "bad" or "inadequate." Id. The Commissioner notes that the regulations would direct a "marked" rating if plaintiff had a serious limitation in her ability to maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, and complete a normal workday or workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. (Def.'s Br. at 19, citing 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(F)(2)(d).)

As plaintiff notes in reply, however, a moderate rating does suggest some limitation, which must be addressed. (Pl.'s Rep. Br. at 3-4.) Pavlicek found that "a 'moderate' limitation in performing at a consistent pace seems consistent with the ability to perform simple, repetitive tasks at a consistent pace," 994 F.3d at 783, but it did so in the context of holding that the ALJ

17

reasonably relied on the consultants' narrative in that case.  See Turner v. Saul, No. 20-C-998, 2021 U.S. Dist. LEXIS 98305, at *35 (E.D. Wis. May 25, 2021); see also Hoeppner, 2021 U.S. Dist. LEXIS 175193, at *23-25.[2]  "The Pavlicek court did not limit or overrule (indeed, did not even cite) DeCamp, so I do not read the decision as setting forth a new rule that a consultant's narrative for unskilled work necessarily accounts for moderate CPP limitations noted earlier in the consultant's report."  Turner, 2021 U.S. Dist. LEXIS 98305, at *36 n.5.

Finally, the Commissioner notes that the Seventh Circuit has over the past two years affirmed numerous ALJ decisions where the claimant had a moderate CPP rating and the RFC included evidence-based limitations such as simple, repetitive tasks.  (Def.'s Br. at 20, collecting cases.)  These decisions (many unpublished) indicate that the Seventh Circuit has not created a categorical rule that an RFC finding of simple, routine, and repetitive tasks, occasional interactions with others, and simple work-related decisions can never account for moderate deficits in CPP.  See Guinta v. Saul, No. 19-C-1350, 2021 U.S. Dist. LEXIS 55571, at *24-25 (E.D. Wis. Mar. 24, 2021).  Under the circumstances here, however, where the consultants' narrative does not account for all of the limitations, the ALJ did not explain how the RFC otherwise addressed them, and the Commissioner makes no argument that the error is harmless, see Jozefyk, 923 F.3d at 498, the matter must be remanded.

**B.    Physical RFC**

As indicated above, the ALJ found plaintiff physically limited to a reduced range of sedentary work.  (Tr. at 20.)  The ALJ explained that due to a combination of her severe and

---

[2]As Judge Joseph noted in Hoeppner, the Pavlicek court did not explicitly set forth the consultants' findings; she accordingly reviewed the district court's decision to find this information.  Id. at *23.  I did the same in Turner.  2021 U.S. Dist. LEXIS 98305, at *36.

non-severe physical impairments, plaintiff was unable to sustain the lifting or carrying requirements of light or greater work and therefore was limited to sedentary work. Additionally, her obesity, arthritis, and fibromyalgia limited her to occasional climbing and postural movements. (Tr. at 24.) In making this finding, the ALJ found partially persuasive the opinions of the agency medical consultants, Drs. Fowler and Chang, who found plaintiff capable of light work. (Tr. at 24.) The ALJ noted that while plaintiff generally presented with mild symptoms and treated conservatively, at times she presented with tenderness, reduced range of motion, and synovitis, and she reported incomplete relief from medications, which supported greater limitations. (Tr. at 25.)

Plaintiff argues that the ALJ failed to tether his physical RFC finding to the record and provide the requisite bridge from the evidence to his conclusion. "Critically, the ALJ relied on no opinion evidence in finding [plaintiff] could perform this range of work." (Pl.'s Br. at 10.) Plaintiff contends that by not adopting any of the physician opinions the ALJ created an evidentiary deficit. (Pl.'s Br. at 11.)

The ALJ must base his RFC determination on the entire record and "is not required to rely entirely on a particular physician's opinion or choose between the opinions any of the claimant's physicians." Schmidt v. Astrue, 496 F.3d 833, 845 (7th Cir. 2007); see also Thomas v. Colvin, 745 F.3d 802, 808 (7th Cir. 2014) ("RFC is a matter for the ALJ alone—not a treating or examining doctor—to decide."). The ALJ considered the entire record here, including the objective medical evidence, the source opinions, and plaintiff's testimony. (See Def.'s Br. at 4-6.) Contrary to plaintiff's argument, the ALJ did not simply split the difference between contrary medical opinions. (See Pl.'s Br. at 11; Pl.'s Rep. Br. at 8.) While Dr. Eis determined that plaintiff could not sustain full-time work given her anticipated absences, he did not

19

otherwise address plaintiff's physical limitations, e.g., regarding her ability to lift, sit, stand, or walk. Indeed, no medical source opinion in the record physically limits plaintiff to a greater extent than did the ALJ's RFC.[3] See Burmester, 920 F.3d at 510 ("This finding was more limiting than that of any state agency doctor or psychologist, illustrating reasoned consideration given to the evidence Burmester presented.").

Plaintiff further argues that, although the ALJ is not required to rely on any specific physician, the ALJ's error in finding a compromised RFC untethered to the record is reflected in his failure to properly evaluate her ability to sit, maintain regular attendance, and use her hands and arms. (Pl.'s Br. at 12-14.) The Commissioner responds that while plaintiff speculates that her various impairments and symptoms might interfere with her ability to work, she fails to identify the specific limitations that should have been included but were not. (Def.'s Br. at 6-7.) At most, plaintiff suggests her impairments may have limited her sitting, required naps or time off work, and resulted in manipulative limitations, but she does not specify how many hours she could sit, how many breaks or absences would be necessary, or what particular manipulative limitations were needed. (Def.'s Br. at 7-8.)

Plaintiff's contention that the ALJ failed to explain how she could sustain the prolonged sitting required for sedentary work falls flat. (Pl.'s Br. at 12.) As the Seventh Circuit recently held in rejecting a similar "evidentiary deficit" argument:

> True, the ALJ did not point to evidence that Vang could perform light work. The ALJ did, however, weigh the evidence and conclude that the record did not support a determination that Vang could not work. Ultimately, it was Vang's burden, not the ALJ's, to prove that he was disabled. Summers v. Berryhill, 864 F.3d 523, 527 (7th Cir. 2017). An ALJ adequately supports his RFC determination when he "consider[s] all limitations supported by [the] record

_____

[3]Plaintiff does not argue that the ALJ erred in evaluating Dr. Eis's opinion.

20

evidence" and "tie[s] the record evidence to the limitations included in the RFC finding." See Jozefyk v. Berryhill, 923 F.3d 492, 497-98 (7th Cir. 2019). Based on the rather limited evidence he had before him, the ALJ fashioned an appropriate RFC.

Vang v. Saul, 805 Fed. Appx. 398, 401-02 (7th Cir. 2020). Here, the ALJ reviewed the objective medical evidence, plaintiff's treatment history, her testimony, and the opinion evidence in determining RFC. The agency medical consultants found that plaintiff could sit about six hours in an eight-hour workday (Tr. at 65, 81), consistent with the sitting required for sedentary work, and plaintiff points to no medical evidence that compels an additional sitting limitation. See Lockett v. Saul, 834 Fed. Appx. 236, 239 (7th Cir. 2020) ("Lockett points to no evidence that compelled a finding that he required more restrictions than Dr. Reid recommended."). Plaintiff faults the ALJ for failing to address the impact of obesity (Pl.'s Br. at 12), but she cites no medical evidence demonstrating that her weight limits her ability to sit,[4] see Skarbek v. Barnhart, 390 F.3d 500, 504 (7th Cir. 2004) (holding that mere speculation about the impact of obesity does not suffice), and the agency consultants took this impairment into account in determining her physical capacity (Tr. at 61, 78). See Prochaska v. Barnhart, 454 F.3d 731, 736-37 (7th Cir. 2006) (affirming where the ALJ adopted the limitations suggested by the reviewing doctors, who were aware of the claimant's obesity).

Plaintiff gains more traction with her argument regarding breaks and absences due to fatigue and headaches. (Pl.'s Br. at 13-14.) The ALJ found the headaches to be a severe impairment (Tr. at 15), yet it is unclear how, if at all, he accounted for this impairment in the RFC. The ALJ stated:

--------------------

[4]The ALJ limited plaintiff to sedentary work with occasional climbing and postural movements based in part on her obesity. (Tr. at 24.)

> Concerning her headaches, the claimant did not present for care while actively experiencing a headache. In October 2018, she reported experiencing two to four migraines a month. Her eye examinations were stable. In October 2019, she reported experiencing two to four migraines a month.

(Tr. at 22, record citations omitted.)  Plaintiff alleged that her headaches lasted from hours to days, causing nausea, vomiting, and sensitivity to light.  (Tr. at 332.)  If, as seems likely, such an episode would preclude work, plaintiff could not sustain full-time employment.  (Tr. at 54: VE testimony that more than one absence per month, including showing up late or leaving early, would preclude competitive work.)  Of course, the ALJ was not required to accept plaintiff's claims regarding the severity of her headaches.  He later stated:

> Concerning her headaches, the claimant was treated with Sumatriptan and propranolol. In June 2018, she reported that her medication was at least somewhat effective and that she was satisfied with her treatment plan. In October 2018, she elected to continue her treatment plan.

(Tr. at 23, record citations omitted.)  But even with this treatment plan, it appears plaintiff continued to experience two to four headaches per month.  The ALJ should on remand address the frequency and severity of plaintiff's headaches and determine whether any additional limitations are required.  See Moore v. Colvin, 743 F.3d 1118, 1127 (7th Cir. 2014) (remanding where the ALJ did not address the "likelihood of absences or breaks at work related to migraines").

Finally, plaintiff argues that the ALJ failed to address evidence of manipulative limitations, e.g., limited wrist motion, hand and elbow synovitis, and reduced grip strength. Plaintiff contends that consideration of such limitations is particularly important, as sedentary jobs generally require good use of the hands.  (Pl.'s Br. at 14, citing SSR 96-9p.)  The ALJ acknowledged that plaintiff displayed synovitis at times, and he cited a September 2019 note documenting normal grip strength.  (Tr. at 23, 959.)  He also partially credited the opinions of

22

the agency consultants, who found no manipulative limitations. Plaintiff notes in reply that the ALJ adopted a more restrictive RFC than the consultants (Pl.'s Rep. Br. at 10-11), but she develops no argument that any of the later-admitted evidence undermines the consultants' opinions on this point. Nevertheless, the ALJ should on remand give explicit consideration to possible manipulative limitations, given the importance to sedentary work. See Myles v. Astrue, 582 F.3d 672, 676-77 (7th Cir. 2009) (remanding where the ALJ acknowledged claims of fatigue and hand limitations but did not articulate reasons for rejecting them, except to say there was no objective medical evidence to support them).[5]

## C. Credibility

As indicated above, the ALJ set forth the two-step test for evaluating a claimant's subjective claims, see SSR 16-3p, finding that while plaintiff's impairments could reasonably be expected to produce the symptoms alleged, plaintiff's statements regarding the intensity, persistence, and limiting effects of those symptoms were not entirely consistent with the medical evidence and other evidence in the record. (Tr. at 21.) In making this finding, the ALJ relied on the relatively mild findings noted by plaintiff's providers, her routine and conservative treatment history, the generally normal diagnostic evidence, and her reported activities. (Tr. at 23-24.)

Review of an ALJ's credibility determination is deferential; so long as the ALJ gives specific reasons supported by the record, a reviewing court will overturn his determination only

---

[5]Regarding fatigue, the ALJ noted: "The claimant generally presented as alert and her treatment notes do not indicate observations of ongoing presentation as fatigued." (Tr. at 16.) He also partially credited the opinions of the consultants, who considered plaintiff's fibromyalgia and hypersomnia, yet concluded that she could sustain full-time work. While the ALJ's failure to say more would not alone require reversal, the ALJ should on remand also give more explicit attention to fatigue.

23

it is "patently wrong." Deborah M. v. Saul, 994 F.3d 785, 789 (7th Cir. 2021). Plaintiff challenges several aspects of the ALJ's analysis here. While I do not agree with all of her contentions, I will remand the matter on this basis as well.

Plaintiff first argues that pain complaints cannot be rejected based solely on the absence of objective medical support, particularly in a case involving fibromyalgia. (Pl.'s Br. at 15, citing Akin v. Berryhill, 887 F.3d 314, 318 (7th Cir. 2018) ("[W]e are troubled by the ALJ's purported use of objective medical evidence to discredit Akin's complaints of disabling pain because fibromyalgia cannot be evaluated or ruled out by using objective tests. An ALJ may not discredit a claimant's testimony about her pain and limitations solely because there is no objective medical evidence supporting it.") (internal citation and quote marks omitted).)

But this does not mean objective medical evidence is irrelevant in a fibromyalgia case. As the Commissioner notes in response, the regulations and case-law permit an ALJ to factor such evidence into his assessment of the severity of a claimant's fibromyalgia symptoms. (Def.'s Br. at 24, citing SSR 12-2p; Gebauer v. Saul, 801 Fed. Appx. 404, 410 (7th Cir. 2020).) Moreover, the ALJ cited a number of factors in support of his credibility finding here, not just the objective medical evidence. See Apke v. Saul, 817 Fed. Appx. 252, 257 (7th Cir. 2020) (noting that to evaluate credibility in a fibromyalgia case "the ALJ will look to the claimant's reported activity levels and treatment received"). And plaintiff alleged several physical impairments in this case, not just fibromyalgia. See, e.g., Stenholtz v. Saul, No. 20-C-1254, 2021 U.S. Dist. LEXIS 215271, at *83 (E.D. Wis. Nov. 5, 2021) (finding no error in ALJ's reliance on normal exam findings, e.g., full strength, normal range of motion and gait, no muscle atrophy, in discussing the claimant's overall physical functioning in a case involving

24

fibromyalgia, obesity, diabetes, and neuropathy).[6]

Plaintiff next challenges the ALJ's reliance on her activities. (Pl.'s Br. 15-16.) "[A]lthough it is appropriate for an ALJ to consider a claimant's daily activities when evaluating their credibility, this must be done with care. We have repeatedly cautioned that a person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time." Roddy v. Astrue, 705 F.3d 631, 639 (7th Cir. 2013) (internal citation omitted). Here, the ALJ mentioned plaintiff's ability to clean, do laundry, and drive, but he failed to explain how any of these activities undermined plaintiff's claims. See Cullinan v. Berryhill, 878 F.3d 598, 603 (7th Cir. 2017) ("[T]he ALJ did not explain why doing these household chores was inconsistent with Cullinan's description of her pain and limited mobility. Nor is any inconsistency obvious, so the ALJ did not substantiate the finding that Cullinan's daily activities reveal any exaggeration of Cullinan's limitations."). The ALJ also cited a planned trip to Texas, but he did indicate whether plaintiff actually went on this trip, much less that she engaged in any activities inconsistent with her claims. See Murphy v. Colvin, 759 F.3d 811, 817 (7th Cir. 2014) ("Given the limited information available on the record, such a vacation as described by Murphy would not be inconsistent with her

---

[6]As the Commissioner notes, any assessment of the severity of fibromyalgia will depend largely on the credibility of the claimant's subjective statements. (Def.'s Br. at 22.) And courts should be wary of second guessing such determinations. See Kolar v. Berryhill, 695 Fed. Appx. 161, 162 (7th Cir. 2017) ("Since pain is subjective and affects people in different ways, it is difficult to determine how much pain is present and how great its effects are. Fibromyalgia can have a wide range of effects. Almost any conclusion an ALJ reaches in such situations may be inconsistent with some evidence in the record and consistent with other evidence. This is where the substantial-evidence standard of review matters."). It is also true, as the Commissioner notes, that the ALJ gave some weight to plaintiff's subjective allegations in finding her more limited than the agency consultants opined. (Def.'s Br. at 23 n.7.) Nevertheless, for the reasons set forth in the text, the ALJ will need to reconsider credibility on remand.

symptoms to the point where her credibility would be diminished."). The ALJ further noted that plaintiff engaged in 15 minutes of cardiovascular exercise on a daily basis, but he failed to explain why exercise—something recommended by her providers (Tr. at 1143)—undermined her credibility. See Carradine v. Barnhart, 360 F.3d 751, 756 (7th Cir. 2004) ("The weight the administrative law judge gave to Carradine's ability to walk two miles was perverse: not only is it a form of therapy, but it is not a form of therapy available at work."); Dominguese v. Massanari, 172 F. Supp. 2d 1087, 1096 (E.D. Wis. 2001) ("Fibromyalgia sufferers are supposed to engage in a comprehensive treatment course that includes pain management, exercise and referral to psychiatric sources."). Plaintiff's pre-onset horseback riding may seem inconsistent with her allegations, but at the hearing plaintiff testified that she rarely rode any longer.[7] (Tr. at 47.) In any event, the Seventh Circuit has noted that engaging in an ill-advised activity resulting in injury hardly supports a conclusion that the claimant can work. Scrogham v. Colvin, 765 F.3d 685, 700 (7th Cir. 2014).

The Commissioner concedes that plaintiff's planned trip to Texas and pre-onset horseback riding were not the strongest reasons for discounting plaintiff's testimony, but notes that these were not the only reasons the ALJ provided. (Def.'s Br. at 25.) The Commissioner contends that plaintiff raises no challenge to the other activities cited by the ALJ, including her daily exercise regimen (Def.'s Br. at 25), but that is incorrect. In her main brief, plaintiff argues that the ALJ failed to explain how these activities undermined her claims and, citing Carradine, that reliance on her exercising was improper. (Pl.'s Br. at 15-16.)

Finally, plaintiff challenges the ALJ's reliance on her conservative treatment, noting that

---

[7]Plaintiff fell from her horse in August 2018, shortly before the alleged onset date. (Tr. at 1310.)

26

the ALJ did not explain what sort of treatment a person with truly debilitating symptoms would have pursued.  (Pl.'s Br. at 16, citing Hughes v. Astrue, 705 F.3d 276, 278 (7th Cir. 2013) ("[The ALJ] was troubled by 'lack of aggressive treatment' for her health problems, without pausing to consider what 'aggressive treatment' might have solved them.").)    The Commissioner responds that there is no regulatory requirement that an ALJ set forth an alternative regimen before relying on the claimant's conservative treatment (Def.'s Br. at 25-26, citing 20 C.F.R. § 404.1529(c); SSR 16-3p), and that the Seventh Circuit has approved consideration of this factor in a fibromyalgia case.  Apke, 817 Fed. Appx. at 258 ("The ALJ also considered Apke's disclosed medical treatment, noting she received only minor doses of prescription medications and injections.").  Moreover, the ALJ did not rely solely on the fact that plaintiff's treatment was conservative; he also observed that conservative measures were effective in addressing at least some of her physical symptoms and largely successful in treating her bipolar disorder.  (Def.'s Br. at 26-27.)

While I mostly agree with the Commissioner on this issue, the ALJ's analysis does contain one significant gap.  As discussed above, while plaintiff told providers her headache medication was at least somewhat effective, she continued to report two to four migraines per month.  The ALJ must on remand address the frequency and severity of plaintiff's headaches.  See Meuser v. Colvin, 838 F.3d 905, 913 (7th Cir. 2016) (noting that there can be a great distance between a patient who responds to treatment and one who is able to enter the workforce).

## IV.  CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is reversed, and the matter is

27

remanded for further proceedings pursuant to 42 U.S.C. § 405(g), sentence four.  The ALJ should on remand reconsider plaintiff's mental RFC, giving particular attention to her limitations in concentration, persistence, and pace; her physical RFC, considering her need for breaks and absences due to headaches and fatigue, as well as possible manipulative limitations; and her credibility, explaining how her activities and response to treatment factor into the analysis.

The clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 27th day of January, 2022.

/s/ Lynn Adelman
LYNN ADELMAN
District Judge